**Raymond Lee McKINNEY,**
**Plaintiff-Appellant,**

v.

**Velma GEORGE, et al.,**
**Defendants-Appellees.**

No. 83–1393.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 28, 1983.

Decided Jan. 20, 1984.

Rehearing Denied April 17, 1984.

Michael E. Rigney, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Georgene M. Wilson, Deputy Atty. Gen., Maureen Kelly Ivory, Asst. Corp. Counsel, Chicago, Ill., for defendants-appellees.

Before CUDAHY and POSNER, Circuit Judges, and WILKINS, Senior District Judge.[*]

POSNER, Circuit Judge.

The plaintiff, Raymond McKinney, brought suit under section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, against a number of defendants, mainly police officers, who he alleges arrested him twice and committed him to a mental hospital without a good reason, in violation of his rights under the Fourteenth Amendment. The district judge granted summary judgment for the defendants and dismissed the complaint, 556 F.Supp. 645, and the plaintiff has appealed.

The complaint alleges that the arrests and commitments were instigated by Velma George, a Democratic precinct captain with whom McKinney was on the outs. The first arrest took place on December 17, 1978. Officers Cardon and Hart arrested McKinney at his apartment at 6151 North Winthrop. The arrest report states that McKinney was "arrested on signed complaints of Wanda Harris, bldg representative, after she related that her tenants in 6151 bldg and tenants of 6155 bldg complained to her that arrestee had kept them

[*] Hon. Philip C. Wilkins of the Eastern District of California, sitting by designation.

awake for previous two nights screaming from his window." The signed complaints are not in the record. Cardon and Hart drove McKinney to the police station at 1940 West Foster. He was taken from there by officers Agnoli and Sauli to Chicago Read Mental Health Center, a city institution, and was involuntarily committed on a petition signed by Agnoli which described the conduct warranting commitment as "creating dist[urbance] and taking clothes off; running naked thru halls." In the blank for the address where the conduct had occurred the petition listed both 6151 North Winthrop (McKinney's apartment building) and 1940 West Foster (the police station), and in the blank for the name of the person who had witnessed the conduct it listed Officer Sauli, who had been at the police station but not at the apartment.

McKinney filed an affidavit in the district court which states that he was taken from the police station to Cermak Memorial Hospital (his brief says he was drugged there, but that is not in the affidavit) before being taken to Read; but Cermak's records show no admission of McKinney. The affidavit also states: "At the time of my arrest on December 17, 1978, I was neither creating a disturbance nor engaged in any illegal conduct." McKinney was released after four days in Read. No charges were brought against him arising out of his arrest, which was for disorderly conduct.

The second "arrest" (a term used loosely, since on the second occasion McKinney was not arrested on suspicion of an offense, but was taken directly to Read) took place on November 13 of the following year (1979). The background of this arrest includes a handwritten petition dated November 10 and signed by Velma George and 22 other residents of McKinney's apartment building, which states: "We the undersigned do hereby declare that Raymond L. McKinney [is] a nuisance, dangerous, intimidating to people living here and around him." Miss George mailed the petition to the police precinct commander, Collins, who told Lieutenant Hamilton to go to the building and take McKinney to Read unless Hamilton thought the situation did not warrant it.

Hamilton, Sparacino, and other police officers seized McKinney at his apartment as before and Sparacino took him to Read, where McKinney was involuntarily committed on a petition signed by Sparacino which states that, "According to Velma George," McKinney had been "walking in building with knifes [sic] and threatening people in building with same." McKinney's affidavit states: "On November 13, 1979, at the time of my arrest and thereafter, I did not resist the arrest in any way nor was I yelling or screaming or otherwise creating a disturbance." The nurse who admitted McKinney to Read was Miss Shore, and the chief of the ward where he was put was Griffin. After several weeks in Read, McKinney was transferred to Chester Mental Health Center, from which he was released in February 1980.

All of the police officers and other public employees named above are defendants in this suit along with the City of Chicago, the Chicago Read Mental Health Center, and Miss George.

■■■ At issue is the constitutionality of two arrests and two commitments, the conduct of 12 defendants, and if that is not complicated enough two constitutional standards. The Fourth Amendment, which so far as pertinent here forbids unreasonable seizures of persons, *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968), has been held to be applicable to the states by virtue of the due process clause of the Fourteenth Amendment. *Wolf v. Colorado,* 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361–1362, 93 L.Ed. 1782 (1949). But even if there were no Fourth Amendment, since arresting a person and putting a person in a mental hospital against his will are deprivations of liberty, these acts would violate the due process clause of the Fourteenth Amendment directly if they were done without due process of law. See, e.g., *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). Usually due process requires notice and a hearing of some sort before the deprivation occurs, but the hearing can be held afterward if there

is a good reason for postponement, see, e.g., *Sutton v. City of Milwaukee,* 672 F.2d 644 (7th Cir.1982), as there would be if a person were taken into custody in an emergency situation.

 Although the two constitutional standards (unreasonable seizure, and deprivation of liberty or property without due process of law) share a common core of concern with protecting people from the consequences of unreasonable governmental activity affecting their liberty and property, the standards are not identical. A host of special rules has grown up around the Fourth Amendment (mainly involving warrants) that have no counterpart when a seizure is analyzed under the due process clause directly. Since the Fourth Amendment standard, especially as elaborated by case law, is the more specific, a seizure that passes muster under the Fourth Amendment should also satisfy the requirements of the due process clause viewed as an independent source of constitutional norms, as suggested in *Fisher v. Washington Metropolitan Area Transit Authority,* 690 F.2d 1133, 1138 and n. 5 (4th Cir. 1982). If, therefore, an arrest is upheld when reviewed under the detailed rules that the courts have developed for determining the lawfulness of an arrest under the Fourth Amendment, the arrested person will not succeed in challenging the lawfulness of the arrest by arguing that he should have gotten a hearing before he was arrested, or otherwise by recasting his challenge in the language of due process rather than search and seizure. So it is enough in this case to decide whether McKinney has raised a genuine issue of material fact (see Fed.R.Civ.P. 56) under the Fourth Amendment regarding the defendants' conduct. McKinney's equal-protection claim— that he was dealt with arbitrarily—is merely a rephrasing of his Fourth Amendment claim, and does not require a separate discussion.

 If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they can-

not be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded. See *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949); cf. *Butler v. Goldblatt Bros., Inc.,* 589 F.2d 323, 325 (7th Cir.1978). Often this conclusion is stated in terms of the officers' qualified immunity from civil liability: if they reasonably believed the arrest was lawful, they cannot be made to pay damages merely because it turns out that they were mistaken. See, e.g., *Lenard v. Argento,* 699 F.2d 874, 884 (7th Cir.1983). But immunity is a defense. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). It comes into play only if the arrest is unlawful, and an arrest is not unlawful merely because the information on which it is based is wrong. If the police have probable cause, the arrest is lawful; and they have probable cause if they believe, with reason, that their informant was telling the truth. So even on the issue of liability, without considering the possible immunity of police officers from civil liability for a false arrest, it is unimportant whether McKinney really kept his neighbors up for two nights by screaming from his window, which he denies in his affidavit, provided that such conduct if true would justify his arrest for disorderly conduct and provided that the police had no reason to believe the complaint was untrue. Screaming from your window for two consecutive nights so loudly as to keep your neighbors awake is disorderly conduct, and there is no suggestion that the arresting officers, Cardon and Hart, doubted that the complaint was true. Although it is regrettable that the signed complaints are not in the record (apparently they were not retained by the police—but then the arrest, which did not result in any criminal charge being lodged against McKinney, occurred several years before the suit was brought), there is no basis for an inference that the contents of the complaints were otherwise than as described in the arrest report.

 Disorderly conduct violates as one would expect a municipal ordinance;

but the police may arrest for such a violation without an arrest warrant only if the arrested person was "found violating" the ordinance. Chicago Munic.Code § 11–25. Thus the officers may have exceeded their authority in arresting McKinney on December 17. (This is far from clear, however: the same ordinance allows the police to arrest without warrant "all persons who break the peace.") But that does not mean they violated the Constitution. The standard of reasonableness under the Fourth Amendment is federal. If police officers have probable cause to make an arrest, as they did here, it is immaterial to the constitutionality of their conduct that the arrest may have violated state law. *United States v. Janik,* 723 F.2d 537, 548 (7th Cir.1983) (distinguishing *United States v. DiRe,* 332 U.S. 581, 589, 68 S.Ct. 222, 226, 92 L.Ed. 210 (1948)); *Fisher v. Washington Metro Area Transit Authority, supra,* 690 F.2d at 1138; *Street v. Surdyka,* 492 F.2d 368, 372 (4th Cir.1974). The absence of a warrant is not critical; although the Fourth Amendment has been interpreted to require that the police have a warrant if they want to arrest a man in his home, *Payton v. New York,* 445 U.S. 573, 585–90, 601, 100 S.Ct. 1371, 1379–82, 1387, 63 L.Ed.2d 639 (1980), Cardon and Hart did not cross the threshold of McKinney's apartment. When he opened the door to their knock they told him to come along with them and he did so. If he had refused and they had come in and taken him we might have a different case. The privacy of his home was not invaded.

The reasonableness of the first commitment of McKinney to Chicago Read depends on the behavior that he exhibited at the police station to which he was taken immediately after his arrest. The petition for commitment states that Sauli observed McKinney creating a disturbance and running naked through the halls. Such behavior gives rise to an inference that the person would be better off being committed to a mental hospital for psychiatric observation than being locked in a jail, charged with disorderly conduct. The only problem is that read literally the petition alleges that the behavior was observed both at the

police station and at McKinney's apartment building, though neither Agnoli nor Sauli were in on the arrest and there is no indication that McKinney created any disturbance when he was arrested. McKinney's affidavit, however, is carefully worded to deny only that he was creating a disturbance then; there is no denial that he created a disturbance at the police station; and the discrepancy in the address in the petition for commitment is not important enough to create an issue for trial. Observing McKinney's behavior at the station, Sauli no doubt assumed that it was a continuation of conduct observed at the time of the arrest. And since McKinney does not complain about being kept for four days in Read at the time of the first arrest (though he does complain about being kept in Read after the second arrest), we may infer that his behavior when he was taken to Read the first time was sufficiently bizarre to justify his being kept there for several days, which makes it most unlikely that the police took him to Read merely to avoid having to release him (whether on bond or unconditionally) after arresting him for disorderly conduct. In any event, the evidence of the petition that Sauli observed McKinney's antics at the station stands uncontradicted and provided a reasonable basis for the police to take McKinney to Read rather than jailing him.

We come to the second arrest. If all that the police had had to go on was the neighbors' petition there would be considerable doubt that the arrest was reasonable. While declaring him a "nuisance," "dangerous," and "intimidating" to his neighbors, the petition provides no factual detail and it is hard to tell from its face whether it is anything more than a request to evict someone they didn't like. There is in particular no reference to brandishing knives. But it is evident from a report of one of the psychiatrists who examined McKinney at Read during his second commitment that the police did know about the knives when they made the arrest. It states that McKinney "reports that he was 'guarding and protecting' the residents of his apart-

ment building by walking the halls with a machette and other knives." McKinney does not deny in his affidavit that he said this to the psychiatrist. All he says bearing on this point is that, "On November 13, 1979, at the time of my arrest and thereafter, I did not resist the arrest in any way nor was I yelling or screaming or otherwise creating a disturbance." No one said he was. The complaint was that he had been brandishing knives before his arrest, and that is not denied. We take it to be established that he was brandishing knives in a threatening manner, that the police knew this, and that they acted reasonably in seizing him and committing him to Read for observation of his mental state. As Commander Collins testified at his deposition, "I told [Hamilton] what the situation was, the alleg[ation that] Mr. McKinney was threatening all these people in the building. The people were in fear to go out of their door, supposedly putting a knife on them, doing this, other things, other verbal threats. He had the whole building in fear."

■ Again there is an argument about the police officers' authority under state law. Illinois law authorizes the police to seize a person and transport him to a mental hospital for involuntary commitment if a petition and medical certificate of need for commitment have been filed, or if the police conclude as a result of their personal observation that the person is subject to involuntary commitment. Ill.Rev.Stat.1981, ch. 91½, §§ 3–605, 3–606. Neither ground existed at the time of the second commitment (the first commitment, in contrast, had been based on Officer Sauli's personal observation of McKinney's behavior at the police station). This is probably an unintended gap in Illinois law, as it could cause catastrophic delay in a case where a private citizen observed dangerously insane behavior and told a policeman about it but neither one had time to file a petition for commitment accompanied by the required medical certificate. Maybe if such a case arose an Illinois court would hold that the police had inherent authority to act in an emergency. But in any event the standard as we have said is federal. Knowing that McKinney had been threatening people with knives the police had to act quickly, and it was reasonable for them to take him directly to Read rather than first to the police station as before.

■ But here it is necessary to distinguish between natural liberty and statutory liberty. An individual who, like McKinney before his arrests, is at large in society is in possession of his natural liberty, and if the state locks him up, whether in a prison or a mental hospital or anywhere else, it is depriving him of liberty within the meaning of the Fourteenth Amendment, and may not do so without due process of law. The arrests deprived McKinney of his natural liberty, though not without due process. But a state can if it wants confer extra liberties which the due process clause will then also protect against deprivations without due process. This principle is established by a series of cases which hold that if a state gives prisoners (whose natural liberty has been suspended) a form of liberty, as by entitling them to release before the end of their terms if they behave themselves for a prescribed period, the state may not deprive them of that liberty, any more than it may deprive a person of his natural liberty, without due process of law. See *Hewitt v. Helms,* —— U.S. ——, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *Vitek v. Jones,* 445 U.S. 480, 489–90, 100 S.Ct. 1254, 1261–62, 63 L.Ed.2d 552 (1980); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Johnson v. Brelje,* 701 F.2d 1201, 1205–06 (7th Cir.1983). *Vitek,* for example, held that where a state prisoner had a right under state law not to be transferred from the prison to a mental hospital unless certain criteria were met, the violation of that right was a deprivation of liberty under the Fourteenth Amendment. In reliance on these cases McKinney argues that in denying police officers the authority to seize without either a petition or personal observation a person suspected of being deranged, the Illinois legislature intended to enlarge the natural liberty of Illinoisans—to give them a right amounting to a liberty to remain at

large unless the requirements of the statute are satisfied. We may assume that the statute indeed created a right under state law. But "a state created procedural right is not itself a liberty interest within the meaning of the Fourteenth Amendment," *Shango v. Jurich,* 681 F.2d 1091, 1101 (7th Cir.1982), and that is all we find here. The Illinois statute evinces no intention to enlarge the natural liberty of dangerous insane persons. Indeed, as we have said, the legislature's failure expressly to authorize the police to act as they did here appears to have been an oversight.

■ This concludes our discussion of the police officers' liability and we turn to Chicago Read Mental Health Center and its two employees Shore and Griffin. McKinney contends that Shore, the admitting nurse, should have realized that the petition for commitment was deficient under state law (for example in containing hearsay rather than the petitioner's personal observations) and that Griffin, the head of the ward, knew not only that the petition was deficient but that McKinney had not been examined by a second psychiatrist within the time required by state law in involuntary commitment cases. Even if all this is true, it is quite unclear that either Shore or Griffin was authorized to release McKinney and therefore responsible for his commitment. But, in any event, the only constitutional question is whether it was reasonable to hold McKinney at Read until he was transferred several weeks later to another mental hospital—a transfer that he does not complain of in this suit. The psychiatrist's report, the accuracy of which McKinney does not contest, shows that it was reasonable. The report states, "During his interview with me, [McKinney] was alternatively laughing inappropriately and menacing and threatening me inappropriately. . . . His choice of clothing, and his inability to relate except through threats to other persons are not in themselves reasons to consider him dangerous, but when taken along with the over[t] threatening acts, do make a strong case for the diagnosis of mental illness and for the belief that he will injure others if not treated for the illness."

The report goes on to express a "high degree of suspicion that [McKinney] may attempt to retaliate on any neighbors who testify against his wishes in the mental health court," and therefore recommends that McKinney be transferred to "the high security facilities at Chester" mental health center—which was done. Neither the contents of the report nor the propriety of the transfer to a maximum security mental health institution is challenged. The report and transfer between them show that Read and its employees acted reasonably in not releasing McKinney.

■ Since the police officers all acted reasonably in respect to McKinney, we cannot find any basis for imposing liability on the City of Chicago, for McKinney's only theory of municipal liability is that the officers were acting unreasonably, pursuant to municipal policy. And with all of the public defendants out of the case the complaint must also be dismissed against Velma George, a private citizen, as McKinney does not contend that her position as a Democratic precinct captain made her a de facto government official by analogy to the "white primary" cases. See, e.g., *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932). As he also concedes that if his federal claims were properly dismissed before trial pendent jurisdiction of his state claims was properly declined, the judgment dismissing the complaint in its entirety against all defendants must be and is

Affirmed.