**Linda BALTZ, Plaintiff,**

v.

**John H. SHELLEY, et al., Defendants.**

**No. 84 C 2198.**

United States District Court,
N.D. Illinois, E.D.

March 3, 1987.

John P. DeRose, John P. DeRose & Assoc., Chicago, Ill., for plaintiff.

William W. Kurnik, Kurnik & Cipolla, Arlington Heights, Ill., Neil K. Quinn, Terri R. Olian, John J. Walsh III, Randall C. Monroe, Pretzel & Stouffer, Chtd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

In this civil rights case, the court must resolve difficult questions regarding the constitutional rights of an individual who allegedly experienced psychological difficulties that threatened the safety of herself and others. The plaintiff is Linda Baltz ("plaintiff"), a former deputy sheriff of Will County. In 1984, she filed this 42 U.S.C. § 1983 (1981) action in which she alleges that on February 23, 1983 certain defendants searched her home without a warrant and arrested her without probable cause in violation of her fourth amendment rights to be free from unreasonable searches and seizures.[1] Moreover, she alleges that the same defendants imprisoned her without a hearing in violation of her fourteenth amendment right against deprivation of her liberty without due process of law. In response to a motion to dismiss, Judge Aspen dismissed all claims against the County of Will on February 2, 1985. *See Baltz v. County of Will,* 609 F.Supp. 992, 1000 (N.D.Ill.1985). Now the remaining defendants move this court for summary judgment on their behalf pursuant to Rule 56 of the Federal Rules of Civil Procedure. Before addressing the merits of the defendants' motions, the court will review the relevant facts in this case.[2]

---

**1.** The Supreme Court has held that the rights encompassed by the fourth amendment are enforceable against the state through the due process clause of the fourteenth amendment. *See*

*Wolf v. Colorado,* 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949).

**2.** As required by local rule, *see* N.D.Ill.Gen.R. 12(e), the defendants filed statements of materi-

# I

## Facts and Procedural History

The plaintiff began working for the Will County Sheriff's Department ("Department") in April, 1976. In January, 1983, the Department reassigned her from the street division to the Joliet City Jail. On January 25, 1983, the jail warden and supervisor of the plaintiff, Sidney Edwards, prepared an employee warning notice regarding the plaintiff. In this notice, Edwards discussed a number of alleged inmate complaints concerning the plaintiff, including inmate claims that the plaintiff had taken photographs of certain inmates in their cells and sprayed mace in the jail in order to kill cockroaches. Edwards concluded in the notice that, in his opinion, action should be taken to evaluate the plaintiff's behavior.

The next day, January 26, 1983, Edwards and an assistant state's attorney met with two of the defendants—the Will County Sheriff John Shelley ("Sheriff Shelley") and Dr. William Hilger ("Dr. Hilger"), a private psychologist. The subject of the meeting was the plaintiff's potential need for psychological care. According to the deposition of Edwards and Dr. Hilger, at the meeting the other parties told Dr. Hilger that the plaintiff suffered from large weight loss[3] and had been acting in an uncharacteristically irrational manner.[4] The other parties further advised Dr. Hilger about the incidents raised in the employee warning notice and told Dr. Hilger that the plaintiff had relabeled the equipment lockers of other officers, refused to perform her duties in connection with showering female inmates and broken a relationship with an intimate male friend.[5] The others were concerned because prior to

the previous several months, the plaintiff had had an excellent work record.[6] The others also expressed to Dr. Hilger the concern that if the hospital psychiatric unit admitted the plaintiff the Department could not employ her as a police officer for at least four years.[7] After listening to the foregoing, Dr. Hilger made a number of recommendations including that a doctor perform a complete physical examination of the plaintiff.[8] Dr. Hilger also told the others that he would phone the plaintiff and encourage her to see him.[9]

On January 27, 1983, the day after the meeting between Dr. Hilger, Sheriff Shelley and the others, the plaintiff met with Sheriff Shelley, Edwards and the assistant state's attorney at the sheriff's office. The plaintiff read and signed the employee warning notice prepared by Edwards. The others, after telling the plaintiff that she appeared depressed and malnourished, requested that she see a doctor for a physical examination and a psychologist for a psychological examination. According to the plaintiff, Sheriff Shelley told her she was suspended until she signed a paper stating she would see a psychologist.[10]

On January 28, 1983, the plaintiff received a letter from Sheriff Shelley informing her that he had placed her on ten-day suspension with pay for being inattentive to and inefficient in the performance of her duties and for neglecting or disobeying orders. In this letter, Sheriff Shelley ordered the plaintiff to see Dr. Hilger. If she failed to do so he would bring her before the Will County Merit Commission.[11]

Also on January 28, 1983, two days after his meeting with Sheriff Shelley and the rest, Dr. Hilger called the plaintiff at her home and urged her to see him for counsel-

---

al facts as to which they contend there is no genuine issue. The court deems to be admitted all material facts set forth in those statements which the plaintiff has not expressly controverted in her response to the pending motions. *See* N.D.Ill.Gen.R. 12(f).

3. Edwards Dep. at 31.

4. Hilger Dep. at 32.

5. *Id.* at 34–36.

6. *Id.* at 37.

7. *Id.* at 38.

8. *Id.* at 38–41.

9. *Id.* at 41.

10. Baltz Dep. at 104.

11. Baltz Dep. Ex. No. 2.

ing. She refused. Subsequently, Dr. Hilger learned from a physician that the plaintiff suffered from menopausal syndrome.[12] Consequently, Dr. Hilger phoned Sheriff Shelley on February 2, 1983 and advised him that some medical support existed for the concerns expressed at their January 26 meeting.[13]

On February 23, 1983, the plaintiff phoned Dr. Hilger and asked him if he would see her at her home. According to Dr. Hilger's deposition testimony, the plaintiff sounded hysterical and was crying that if Dr. Hilger did not see her she would kill herself.[14] Dr. Hilger, concluding a "crisis situation" was at hand,[15] called Sheriff Shelley, told him of the plaintiff's phone call and informed him that the plaintiff was possibly depressed and suicidal.[16] Sheriff Shelley asked Dr. Hilger if Dr. Hilger would be willing to see the plaintiff.[17] Dr. Hilger responded that he would consider a home visit if accompanied by two deputies.[18] Sheriff Shelley selected the two other defendants, Deputy Craig Butkovick ("Butkovick") and Deputy Paul Kaupus ("Kaupus"). Butkovick and Kaupus picked Dr. Hilger up in a squad car and drove him to the plaintiff's home.[19]

Dr. Hilger, Butkovick and Kaupus arrived at approximately 10:30 p.m. The plaintiff invited them into her home although she questioned Dr. Hilger as to why the two deputies were present.[20] While the deputies remained in the living room, Dr. Hilger attempted to speak to the plaintiff alone in the kitchen. Dr. Hilger's private discussion with the plaintiff led him to form the opinion that the plaintiff was having some serious emotional and mental problems and was severely intoxicated, depressed, suicidal and dangerous to herself and others.[21] According to his deposition testimony, Dr. Hilger believed at that time that something had to be done immediately.[22] After approximately three to four hours of conversation with the plaintiff, Dr. Hilger conveyed his opinion to Kaupus who in turn phoned Sheriff Shelley. After Kaupus gave him the phone, Dr. Hilger conveyed his impressions to Sheriff Shelley and recommended that the plaintiff be placed in some facility overnight with medical evaluation and treatment to follow the next morning. According to Dr. Hilger's deposition testimony, he recognized that procedures existed for committing the plaintiff to a mental-health facility[23] but feared that doing so would preclude the plaintiff from working as a police officer for the next four years.[24] After listening to Dr. Hilger, Sheriff Shelley told Dr. Hilger that he was ordering that the plaintiff be taken to jail.[25]

After his phone conversation with Sheriff Shelley, Dr. Hilger, according to the plaintiff's deposition testimony, told the plaintiff he wanted her to turn over her guns.[26] When told they did not have a search warrant, the plaintiff refused. According to the plaintiff, Dr. Hilger then told the deputies to search her house and find her guns.[27] Over the plaintiff's objection, Dr. Hilger and the two deputies then went in the plaintiff's bedroom and began their search of her drawers.[28] After the search, Dr. Hilger told the plaintiff that

---

12. Hilger Dep. at 59.

13. *Id.* at 62–63.

14. *Id.* at 67–68.

15. *Id.* at 68.

16. *Id.* at 69–70.

17. *Id.* at 71.

18. *Id.*

19. *Id.* at 72.

20. Baltz Dep. at 153.

21. Hilger Dep. at 116, 124, 127, 129.

22. *Id.* at 127, 139.

23. *See* Ill.Rev.Stat. ch. 91½, par. 3–601 to –611 (1987).

24. Hilger Dep. at 128.

25. *Id.* at 139; Kaupus Dep. at 51.

26. Baltz Dep. at 207.

27. *Id.* at 210.

28. *Id.* at 211. The evidence on the scope of the search of the plaintiff's home is sketchy.

she was going to jail.[29] When asked why they were arresting her, Dr. Hilger gave no explanation.[30] At approximately 3:00 a.m., Dr. Hilger and the two deputies transported the plaintiff to the jail where she remained until 2:30 p.m. on February 24, 1983, at which time she was admitted to a hospital.

The plaintiff instituted this action on March 15, 1984 in a four-count complaint naming the County of Will, Sheriff Shelley, Dr. Hilger, Butkovick and Kaupus as defendants. Counts I and II allege violations of § 1983. As interpreted by Judge Aspen, Count I alleges that the defendants' actions violated the plaintiff's fourth amendment rights against unreasonable searches and against arrest without probable cause. *See Baltz,* 609 F.Supp. at 996. Judge Aspen interpreted Count II to be a fourteenth amendment due process claim. *Id.* Counts III and IV allege pendent state-law claims of false arrest and imprisonment and intentional infliction of emotional distress.

In his opinion addressing the defendants' motion to dismiss, Judge Aspen dismissed the County of Will from the suit because the plaintiff's conclusory allegations of a county "policy" were insufficient to state a claim in light of the legal independence of the sheriff's office from the county. *Id.* at 995 (citing Ill.Rev.Stat. ch. 125, § 13 (1967)). In addressing Sheriff Shelley's motion to dismiss the plaintiff's due process challenge to his psychological-testing policy, Judge Aspen dismissed any facial challenge to the policy because the plaintiff conceded the constitutionality of the psychological-testing requirement on its face.[31] *Id.* at 996.

Judge Aspen denied, however, Sheriff Shelley's motion to dismiss the due process challenge to his psychological-testing policy as implemented in the plaintiff's case. *Id.* In so doing, Judge Aspen stated the following:

[The plaintiff] states that her due process rights were violated when the defendants allegedly searched her home, arrested her, denied her access to counsel and jailed her, all without probable cause or judicial process. The Sheriff asserts that [the plaintiff] has only stated a Fourth Amendment violation, which they do not challenge in the motion to dismiss. We think the facts alleged in the complaint plainly support a due process claim in addition to a Fourth Amendment claim. Apart from the warrantless search, the alleged arrest and the imprisonment deprived [the plaintiff] of her liberty without any process, let alone due process.

*Id.*

Judge Aspen also rejected Dr. Hilger's claim that the complaint did not allege sufficient facts to support the plaintiff's § 1983 claim that Dr. Hilger acted under color of state law. In so holding, Judge Aspen found that the "under color of law" requirement of § 1983 has been equated with the state-action requirement of the fourteenth amendment. *Id.* at 997 (citing *Rendell-Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982)). A state can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must be deemed to be that of the state. *Id.* (citing *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982)). In other words, if the state places its "imprimatur" on the private action, it becomes state action. *Id.* (citing *Blum,* 457 U.S. at 1003, 102 S.Ct. at 2785).

Based on the foregoing analysis of the "nexus" theory, Judge Aspen concluded that according to the facts alleged in the complaint, the "state," via Sheriff Shelley, had placed its imprimatur on Dr. Hilger's acts. *Id.* at 997–98, 102 S.Ct. at 2782. In

---

**29.** Baltz Dep. at 223.

**30.** *Id.* at 224.

**31.** Because of the plaintiff's concession to the facial constitutionality of the psychological-test-

ing requirement, Judge Aspen expressed and this court expresses no opinion on the merits of such a potential due process challenge. *See Baltz,* 609 F.Supp. at 996.

so finding, Judge Aspen relied on the plaintiff's allegation that Dr. Hilger was hired by Sheriff Shelley to perform psychological testing, that on the night of the arrest Dr. Hilger was acting under orders of the sheriff and ordered the uniformed deputies to search the plaintiff's house and arrest her, and that, again with the approval of the sheriff, Dr. Hilger gave the plaintiff the "choice" of remaining in jail or moving into the hospital. *Id.* Judge Aspen found *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), a Supreme Court case in which the state regulated and funded the private action but played no part in the alleged constitutional wrong, to be distinguishable because in this case the sheriff allegedly paid for, encouraged and ordered the unconstitutional conduct. *Id.* 457 U.S. at 998, 102 S.Ct. at 2782.

■ Alternatively, Judge Aspen found the requisite state action under a "conspiracy" theory. *Id.* at 998, 102 S.Ct. at 2782 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Under the conspiracy theory of state action, an individual acts "under color" of law if he is a wilful participant in joint activity with the state or its agents. *See Adickes*, 398 U.S. at 152, 90 S.Ct. at 1605. Judge Aspen found that the plaintiff had satisfied the pleading requirements for a conspiracy by alleging Dr. Hilger's employment relationship with the sheriff and alleging that Dr. Hilger (1) accompanied the deputies to the plaintiff's home, (2) *ordered* them to search the house and arrest the plaintiff, (3) told the plaintiff that no arrest warrant existed but that she had to come with him, and (4) told the plaintiff she had to choose between jail and a mental hospital. *Baltz*, 609 F.Supp. at 999.

After this case was transferred to this court, Dr. Hilger and the other remaining defendants separately moved for summary judgment. The court now turns to the merits of those motions.

## II

### Motions for Summary Judgment

In deciding whether to grant these motions for summary judgment, the court must determine if there is a genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether any issues of material fact are in dispute, the court must view the inferences drawn from the record in the light most favorable to the non-moving party. *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir.1986). Once the moving party has demonstrated the absence of a genuine issue of material fact, the opposing party cannot rest on general allegations or denials in his pleadings, but rather must show through affidavits or other material that a specific factual issue exists. *Valentine v. Joliet Township High School District*, 802 F.2d 981, 986 (7th Cir.1986). Generally, the inquiry that the court must perform is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finding of fact because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, — U.S. ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### A. Under Color of State Law

Without mentioning Judge Aspen's discussion of the issue, Dr. Hilger again argues at length in his memorandum in support of his motion for summary judgment that during the period in question he did not act under color of state law for purposes of § 1983. Since Dr. Hilger's arguments impress this court as a frontal attack on the opinion written by Judge Aspen, the court first will treat Dr. Hilger's motion as one for reconsideration of the denial of his motion to dismiss.

■ Conduct that constitutes "state action" for purposes of the fourteenth amendment's due process clause also is conduct "under color of state law" for purposes of § 1983 actions. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935, 102 S.Ct. 2744, 2752, 73 L.Ed.2d 482 (1982). In *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the Supreme Court identified three factors to be con-

sidered in determining whether particular conduct constitutes "state action" under the "nexus" test. First, a sufficiently close nexus exists between the state and the challenged action such that the action of the latter may be fairly treated as that of the state itself. *Blum*, 457 U.S. at 1004, 102 S.Ct. at 2785. Second, a state normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must be deemed to be that of the state. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the state responsible for those initiatives under the fourteenth amendment. *Id.* at 1004–05, 102 S.Ct. at 2785–86. Third, the required nexus may be present if the private entity has exercised powers that are traditionally the exclusive prerogative of the state. *Id.* at 1005, 102 S.Ct. at 2786.

In a case decided subsequent to *Blum*, the Supreme Court made the finding that a person's actions were "under color of state law" if that person engaged in a conspiracy with state officials to deprive another of federal rights. *See Tower v. Glover*, 467 U.S. 914, 104 S.Ct. 2820, 2924, 81 L.Ed.2d 758 (1984). Because the Court did not discuss the *Blumm* factors for finding state action, it appears that the conspiracy test is an alternative method for determining if an individual's acts were performed under color of state law.[32]

■ In light of the foregoing, the court reaffirms the holding of Judge Aspen on this issue on both the nexus and conspiracy theories. On the night in question, Dr. Hilger arrived at the plaintiff's home in a police squad car with two deputies in tow. Dr. Hilger effectively ordered the deputies to perform certain tasks on separate occasions that evening, including the moment when he told the deputies to search the plaintiff's house for weapons. Evidence has been introduced that Dr. Hilger told the plaintiff to turn over her guns and that she was going to jail. Statements such as these are consistent with the plaintiff's theory that under the circumstances Dr. Hilger believed that he was cloaked in official authority. His frequent phone calls that evening to Sheriff Shelley to discuss recent occurrences and plan out future acts are consistent with either the theory that Sheriff Shelley effectively ordered Dr. Hilger to perform certain acts or that Dr. Hilger, Sheriff Shelley and the deputies reached an agreement to perform those acts. Moreover, the existence of the psychological-testing policy, Dr. Hilger's participation in the implementation of that policy, his presence at meetings discussing future courses of action regarding the plaintiff and Sheriff Shelley's orders to the plaintiff to see Dr. Hilger further give credence to the plaintiff's argument that Dr. Hilger acted under color of state law either under a nexus or conspiracy theory.

■ The court reminds Dr. Hilger that on a motion for summary judgment the court's objective is not to resolve factual disputes such as this one. Instead, the court need only determine if a genuine issue of material fact exists on this question. In civil rights cases such as this where the allegation of conspiracy is made and a genuine factual dispute exists regarding that allegation, the court must deny a motion for summary judgment. *See Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608.

In summary, the court reaffirms the logic of Judge Aspen's opinion and finds that a genuine issue of material fact exists regarding the question of whether Dr. Hilger acted under color of state law.[33]

### B. Arrest Without Probable Cause

The plaintiff contends that when Dr. Hilger told her she was going to jail and when Dr. Hilger and the two deputies brought her to jail that evening, the defendants effectively arrested without probable cause in violation of her fourth amendment right against unreasonable seizures of her per-

---

**32.** This finding is consistent with Judge Aspen's opinion. *See, Baltz,* 609 F.Supp. at 998.

**33.** The court does not find it necessary in this opinion to distinguish cases raised by Dr. Hilger on this motion that Judge Aspen considered in deciding the motion to dismiss.

son. The defendants do not dispute that at the time of the arrest they had no reason to believe that the plaintiff had committed a crime. Instead, they argue that at the time of the arrest, probable cause existed to believe that the plaintiff needed to be confined for her own safety. Since provisions exist under Illinois law for the involuntary hospitalization of individuals who are potentially dangerous to themselves or others, *see* Ill.Rev.Stat. ch. 91½, par. 3–601 to –611 (1987), the defendants argue that the plaintiff's arrest was constitutionally valid.

Under Illinois law, a person is subject to involuntary admission to a mental health facility if the person is "mentally ill and ... because of his illness is reasonably expected to inflict serious physical harm upon himself or another in the near future or ... who is mentally ill and ... because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm." *Id.* ¶ 1–119. Involuntary-commitment proceedings may be initiated in several different ways.[34] Any individual over the age of 18 may begin commitment proceedings by preparing a petition stating that the individual is in need of commitment. *Id.* ¶¶ 3–601(a), 3–701(a). The petition must be accompanied by a "certificate executed by a physician, qualified examiner, or clinical psychologist which states that the respondent is subject to involuntary admission and requires immediate hospitalization." *Id.* ¶ 3–602. The patient must have been examined by the person executing the certificate less than 72 hours prior to admission. *Id.* Unless a court orders otherwise, the respondent is permitted to remain in his place of residence pending any examination. *Id.* ¶ 3–704(a). The respondent may be accompanied by his attorney to the place of the examination. *Id.* Upon receipt of the petition and certificate, the county sheriff or sheriff's designee transports the respondent to the appropriate facility. *Id.* ¶ 3–605. If a certificate has not been acquired, the respondent may be held for no more than 24 hours. *Id.* ¶¶ 3–604, 3–607, 3–704(a). Even when the petition is accompanied by an examiner's certificate, a second certificate must be completed by a psychiatrist after an examination of the respondent if she is held for more than 24 hours. *Id.* ¶ 3–610.

Certain public officials can begin involuntary commitment proceedings on the basis of their own observations. If reasonable grounds exist to believe a person should be committed involuntarily, "peace officers," defined as "any sheriff, police officer or other person deputized by proper authority to serve as a peace officer,"[35] may take a person into custody and to a mental-health facility when, as a result of his personal observation, the peace officer has "reasonable grounds to believe that the person is subject to involuntary admission and in need of hospitalization to protect such person or others from physical harm." *Id.* ¶ 3–606. Upon arrival at the facility, the officer is to complete the required petition. *Id.*

A number of procedural safeguards are built into the system to protect prospective patients. For example, within twelve hours after the admission of a person to a mental-health facility, the facility director must give the person a copy of the petition and a clear and concise written statement explaining the person's legal status, right to counsel, and right to a court hearing. *Id.* ¶ 3–205. After commitment proceedings are initiated, a comprehensive physical and mental examination must occur within 24 hours after admission. Patients must be told prior to the examination its purpose, that they do not have to talk to the examiner and that any statements made by the patient may be disclosed at a court hearing on the issue of eligibility for involuntary admission. *Id.* ¶ 3–208. If a hearing is necessary, it must be held within five days of admission. *Id.* ¶ 3–706.

■■■ Returning to the facts of this case, the court finds that the plaintiff's

---

34. For a discussion on involuntary civil commitment in Illinois generally, *see The Involuntary Civil Commitment Process in Chicago: Practices and Procedures,* 33 DePaul L.Rev. 225 (1984).

35. Ill.Rev.Stat. ch. 91½, par. 1–118 (1987).

arrest constitutes a "seizure" for purposes of the fourth amendment.[36] Although prior criminal activity is not an issue in the case, the defendants still transported the plaintiff against her will to a jail where she remained for a period of approximately twelve hours. An arrest made in violation of fourth amendment standards will give rise to an action under § 1983. *See, e.g., Llaguno v. Mingey,* 763 F.2d 1560, 1563–65 (7th Cir.1985), *cert. dismissed,* —— U.S. ——, 107 S.Ct. 16, 92 L.Ed.2d 783 (1986). Typically, in the case of a warrantless arrest such as this one, the inquiry the court must perform is to determine whether, at the moment the arrest was made, the arresting officers had probable cause to make it, i.e., whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the individual in question had committed or was committing an offense. *See, e.g., Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Probable cause means a reasonable basis—"more than

bare suspicion, but less than virtual certainty"—for believing that a seizure is necessary. *See Llaguno,* 763 F.2d at 1565 (citations omitted).

■ Because the issue of probable cause usually arises in the context of a motion to suppress evidence which the judge decides, ordinarily the issue is one for the court. *Id.* But where the issue arises in a damage suit it is properly an issue for the jury if there is room for a difference of opinion. *Id.* Because the reasonableness inquiry generally is best left to the jury, courts are generally hesitant to grant summary judgment in § 1983 actions which raise the issue of probable cause. *See Reardon v. Wroan,* 811 F.2d 1025, 1027 (7th Cir.1987); *Llaguno,* 763 F.2d at 1565.

■ The court agrees with Judge Aspen's holding in *McKinney v. George,* 556 F.Supp. 645, 650 n. 12 (N.D.Ill.1983), *aff'd,* 726 F.2d 1183 (7th Cir.1984) that the transportation to a mental-health facility of a person whose mental health renders her a danger to herself and others is valid so long as probable cause exists to believe

---

**36.** In summary fashion, the defendants contend that the protections of the fourth amendment are inapplicable in this case because the defendants did not take the plaintiff into custody pursuant to a criminal investigation. The fourth amendment's language, however, does not make the distinction between civil and criminal searches and seizures; instead, the fourth amendment protects "against unreasonable searches and seizures" period. In a case based on facts similar to this one, the District of Columbia Circuit in *In re Barnard,* 455 F.2d 1370, 1373–74 (D.C.Cir.1971) held that the fourth amendment's prohibition is not limited to criminal arrests but instead applies in any case in which an individual is taken into custody against his will. This holding is consistent with the broad language used by the Supreme Court in cases such as *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968) where the Court stated that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." The Supreme Court has also held that the fourth amendment prohibition against unreasonable searches protects against warrantless intrusions during civil as well as criminal investigations. *See Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978). *Accord Matter of Cerro Copper Products Co.,* 752 F.2d 280, 282 (7th Cir.1985).

The court, however, recognizes that precedent to the contrary exists. Certain courts have held

that commitment proceedings are not analogous to criminal investigations and that therefore those committed are not protected by the fourth amendment. *See Sabo v. O'Bannon,* 586 F.Supp. 1132, 1138 (E.D.Pa.1984). *Cf. Strack v. Donahue,* 535 F.Supp. 772, 774 (N.D.Ill.1981) (Moran, J.) (the requirements of "due process" in the civil context and "probable cause" in the criminal context provide protection against unnecessary state infringement upon the individual's right to liberty). Moreover, the Supreme Court has on at least two occasions stated in footnotes that the principal concern of the fourth amendment's prohibition against unreasonable searches and seizures is with intrusions on privacy in the course of criminal investigations. *See Ingraham v. Wright,* 430 U.S. 651, 673 n. 42, 97 S.Ct. 1401, 1413, n. 42, 51 L.Ed.2d 711 (1977); *Whalen v. Roe,* 429 U.S. 589, 604 n. 32, 97 S.Ct. 869, 878 n. 4, 51 L.Ed.2d 64 (1977). But these footnotes appear to conflict with the court's express language extending the fourth amendment to civil searches. *See Marshall,* 436 U.S. at 312, 98 S.Ct. at 1820.

In summary, this court finds that the fourth amendment protections against unreasonable seizures extend to the factual situation confronting us here. This holding, however, is without prejudice to the defendants' renewing their motion on the issue and fully briefing this issue.

that the person is in need of hospitalization and the statutory protections of the Illinois Mental Health and Developmental Disabilities Code, Ill.Rev.Stat. ch. 91½ (1987) are adhered to. This court holds that, analagous to the aforementioned standard for probable cause in cases where a crime had occurred or was about to occur, probable cause to hospitalize a person against that person's will exists where the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant an individual of reasonable caution in the belief that an immediate danger exists of the person hurting herself or others. *Cf. Williams v. Kobel*, 789 F.2d 463, 471 (7th Cir.1986) (discussing probable-cause standard in cases where an officer believes a person has committed or is about to commit a criminal offense); Ill.Rev.Stat. ch. 91½, ¶ 3–606 (1987). Consequently, if in this case probable cause to hospitalize the plaintiff did not exist at the time she was taken into custody, then an infringement of her fourth-amendment right against unreasonable seizure occurred.[37]

The parties do not agree on the question of whether on February 23, 1983 the plaintiff made statements threatening that she would kill herself or others, nor do they agree on the question of whether she exhibited other dangerous signs that evening. The defendants contend that the plaintiff told them that she was going to kill herself, her children and them that evening.[38] They also claim that the plaintiff was in a frenzied emotional state and that she was acting crazy.[39] But the plaintiff testified at her deposition that she did not make such statements to the defendants, nor did she ever become hostile that evening.[40] The only threatening statement she claims

she made was the statement that "someone could get hurt here," a statement made while the defendants searched her bedroom.[41] Under the circumstances, it was clear she said that only to stop the defendants from searching through her personal belongings.[42] To further support these claims, the plaintiff attached to her memorandum in opposition of Dr. Hilger's motion a copy of Dr. Hilger's notes taken that evening. Two of the written entries made were "no thoughts of dying" and "no suicide thoughts."

In light of the foregoing factual dispute and heeding the admonitions of the Seventh Circuit regarding motions for summary judgment regarding issues concerning probable cause, *see, e.g., Reardon*, 811 F.2d at 1027, the court is not satisfied that the defendants have met their burden on the issue of probable cause to arrest. Since the defendants rely heavily on their own deposition testimony, an evaluation of the defendants' credibility is peculiarly important. The court, of course, cannot make that determination without a trial. *See* 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 56.11 [1.–3] (2d ed. 1985); 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil § 2722, at 51 (1983). But more importantly, the plaintiff has presented a conflicting story. Although a motion for summary judgment can be granted on the basis of depositions, the court should not resolve conflicts in credibility unless the opponent's evidence is too incredible to be believed by reasonable minds. *Cf. Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 909 (3rd Cir.1984). Here, the plaintiff's testimony is not inherently incredible; instead, she is merely claiming that what the defendants say hap-

---

37. The fourth amendment issue concerns whether the defendants could take the plaintiff into custody for purposes of hospitalization. The fourteenth amendment due process question concerns whether the defendants followed all of the procedural protections provided by statute after the plaintiff was taken into custody.

38. *See* Butkovic Dep. at 69; Kaupus Dep. at 33–34; Hilger Dep. at 70, 116.

39. *See* Butkovic Dep. at 69; Kaupus Dep. at 41.

40. *See* Baltz Dep. at 198, 207.

41. *See id.* at 219.

42. *See id.*

pened that night is not true. The question of who is telling the truth in this case is better left to a jury.

The defendants reliance on *McKinney v. George,* 726 F.2d 1183 (7th Cir.1984) is misguided. In *McKinney,* the Seventh Circuit found that the district court properly granted certain police officers' motions for summary judgment on the issue of probable cause to arrest because the officers reasonably relied on the complaints of McKinney's neighbors to arrest McKinney for disorderly conduct. In that case, McKinney did not dispute the existence of neighbor complaints; instead he argued such complaints alone did not constitute probable cause to arrest because they later could turn out to be unfounded. *See McKinney v. George,* 726 F.2d 1183, 1187 (7th Cir.1984). Here, the plaintiff disputes the very existence of the statements she allegedly made that evening and on which the defendants purportedly relied to arrest her. If she were to concede that she had said she was going to kill herself, this court's ruling would be different.

■ Kaupus and Butkovick further argue that if Sheriff Shelley ordered them to arrest the plaintiff, they could not be held liable for doing so unless such an arrest was patently unconstitutional. Even assuming the truth of this statement, the court still cannot grant Kaupus and Butkovick summary judgment on this ground for two reasons. First, Sheriff Shelley apparently told the deputies to bring the plaintiff to jail based largely on the deputies' report over the phone of the events of that evening. If that report was inaccurate, as the plaintiff claims it was, then the sheriff's order can be directly attributed to the deputies. *Cf. Olson v. Tyler,* 771 F.2d 277, 281 (7th Cir.1985) (an officer could be held liable under § 1983 if a judicial finding of probable cause for a warrant was based solely on information that officer knew to be false or would have known was false had he not recklessly disregarded the

truth). Second, assuming Sheriff Shelley ordered the plaintiff's arrest without relying on the deputies' report, the court finds that a genuine issue exists as to whether the deputies' acts were still patently unconstitutional. If the plaintiff's description of that evening is accurate, she did nothing to evidence an immediate danger of hurting herself or others. If that was the case, the deputies' arrest very likely was patently unconstitutional.

## C. Unlawful Search

■ The court also rejects the defendants' argument that they are entitled to summary judgment on the plaintiff's fourth-amendment claim that the search of her home was unreasonable. The court recognizes that an arresting officer after making an arrest can search the arrestee's person and the area within the arrestee's "immediate control," i.e., the area from within which she might gain possession of a weapon or destroy evidence. *See Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). But in this case, the evidence does not support the proposition that the defendants searched the plaintiff's home incident to her arrest or that they searched only areas within her immediate reach. In fact, it appears that the arrest did not occur until after the defendants had conducted the search [43] and that its scope extended to the plaintiff's attic,[44] far beyond the reach of the plaintiff.

The court will not absolve the defendants' conduct because the plaintiff followed the defendants to the places where they searched her things. To do so would mean that the defendants could create a situation where they could search areas within the plaintiff's immediate control by dragging the plaintiff to those areas—thereby making a mockery of the protections provided by the fourth amendment. *See, e.g., United States v. Wright,* 577 F.2d 378, 381 (6th Cir.1978).

**43.** Baltz Dep. at 219, 223.

**44.** Butkovick Dep. at 46.

## D. Deprivation of Liberty Without Due Process [45]

■ The court grants the defendants' motion for summary judgment on the procedural due process claim because adequate state remedies are available to the plaintiff under Illinois law. Under *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), a person does not state a due process claim for deprivation of a property interest if an adequate state-law remedy is available. The Seventh Circuit appears to have extended the logic of *Parratt* to cases involving deprivation of liberty interests. *See, e.g., Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 199 (7th Cir.1985); *Guenther v. Holmgreen*, 738 F.2d 879, 882 (7th Cir.1984), *cert. denied*, 469 U.S. 1212, 105 S.Ct. 1182, 84 L.Ed.2d 329 (1985); *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1147 (7th Cir.1983); *Ellis v. Hamilton*, 669 F.2d 510, 515 (7th Cir.1982), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). Even if the Seventh Circuit has not so held, for the reasons set forth by the Eleventh Circuit in *Burch v. Apalachee Community Mental Health Services*, 804 F.2d 1549, 1553–57 (11th Cir. 1986), the court finds *Parratt* applicable here.

■ In this case, the plaintiff can and does sue the defendants for the state-law cause of action of false imprisonment. The common-law tort of false imprisonment is an unlawful restraint of an individual's personal liberty or freedom of locomotion and will lie against the persons actually procuring or participating in such restraint either directly or by virtue of others acting in their stead. *Luker v. Nelson*, 341 F.Supp. 111, 120 (N.D.Ill.1972) (Will, J.). Under Illinois law, unlawful detention following an arrest may constitute a false imprisonment even if the arrest itself is valid. *Id.* In Count III of her complaint, the plaintiff alleges a false-imprisonment claim. The defendants have not raised the possibility that they are immune from such a claim; consequently, the court holds that they have waived any immunity defenses to the false-imprisonment claim. The retribution the plaintiff seeks pursuant to her due process claim, i.e. damages for her allegedly unlawful detention, can be attained by means of her false-imprisonment claim. *See Rodgers*, 771 F.2d at 199.

## E. Qualified Immunity

■ As government officials performing discretionary functions, the defendants correctly state that they are shielded from liability for civil damages insofar as their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). But as this court has already stated, evidence exists to support the proposition that the defendants blatantly violated the plaintiff's fourth amendment rights. At a minimum, the court finds that, even though the issue is one of law for the court to decide, *see Llaguno*, 763 F.2d at 1569, the present record is insufficient for making a determination on the immunity issue. *See Reardon*, 811 F.2d at 1030.

---

**45.** The court's reading of the plaintiff's complaint and Judge Aspen's opinion, *see Baltz*, 609 F.Supp. at 996, leads the court to interpret the plaintiff's due process claim as a procedural due process claim as opposed to a substantive due process claim. Substantive due process violations occur when the challenged conduct was so egregious that it shocks the conscience, *see, e.g., White v. Rochford*, 592 F.2d 381, 383 (7th Cir. 1979); *Borek v. Town of McLeansboro*, 609 F.Supp. 807, 809 (S.D.Ill.1985), as well as in cases where other independent constitutional provisions incorporated in the fourteenth amendment have been violated. *See, e.g., Guenther v. Holmgreen*, 738 F.2d 879, 883 (7th Cir. 1984) (fourth amendment violation), *cert. denied*, 469 U.S. 1212, 105 S.Ct. 1182, 84 L.Ed.2d 329 (1985). *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) is not applicable to instances where the substantive guarantees of the Constitution are alleged to be violated, as opposed to alleged violations of procedural due process. *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 872 (7th Cir.1983). Although the court does not address the "shock the conscience" substantive due process test, this opinion is without prejudice to the plaintiff's amending her complaint to add such a claim.

### CONCLUSION

The court grants the defendants' motions for summary judgment on the plaintiff's procedural due process claim but denies their motions for summary judgment on the plaintiff's fourth amendment claims.