USCA1 Opinion

 

 United States Court of Appeals For the First Circuit For the First Circuit _________________ No. 96-1528 JEREMIAH P. AHERN, Plaintiff, Appellant, v. PHILIP O'DONNELL, PATRICIA McBRIDE, TONIE MORAN, DAVID CELLA, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES, and THE UNIVERSITY OF MASSACHUSETTS, Defendants, Appellees. _________________ ERRATA SHEET The opinion of this Court issued on March 31, 1997, is amended as follows: Cover sheet: Delete "1977" and insert in its place "1997."  United States Court of Appeals For the First Circuit ____________________ No. 96-1528 JEREMIAH P. AHERN, Plaintiff, Appellant, v. PHILIP O'DONNELL, PATRICIA McBRIDE, TONIE MORAN, DAVID CELLA, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES, and THE UNIVERSITY OF MASSACHUSETTS, Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Douglas P. Woodlock, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Skinner,* Senior District Judge. _____________________ ____________________ Thomas Gilbert Massimo for appellant. ______________________ Terence P. O'Malley with whom Joyce A. Kirby was on brief for ____________________ _______________ appellees Philip O'Donnell, Patricia McBride, David Cella, and University of Massachusetts. Janet Nally Barnes with whom William J. Dailey, Jr., Robert G. ___________________ ________________________ _________ Eaton, and Sloane and Walsh were on brief for appellee Tonie Moran. _____ ________________ ____________________ March 31, 1997 ____________________  ____________________ *Of the District of Massachusetts, sitting by designation. Per Curiam. Plaintiff-appellant Jeremiah P. Ahern Per Curiam. ___________ brought suit in federal court against five individuals and three entities, seeking declaratory relief and damages for a variety of civil rights violations and common-law torts. The complaint alleged that the defendants violated Ahern's rights under the Fourth and Fourteenth Amendments and asserted pendent state-law claims for, inter alia, false arrest, false _____ ____ imprisonment, and infliction of emotional distress. The claims were based upon events that resulted in Ahern's involuntary admission to a psychiatric facility and the subsequent termination of his employment as a police officer with the University of Massachusetts at Boston ("UMB") Department of Public Safety ("DPS"). The complaint named as defendants, in both their individual and official capacities, Captain Philip O'Donnell, acting director of the UMB DPS at the time of Ahern's involuntary admission to the Arbour Hospital ("Arbour"); David Cella, director of the UMB DPS at the time Ahern's employment was terminated; Sergeant Patricia McBride of the UMB police force; Dr. Tonie Moran, consulting psychologist to the UMB DPS; and Dr. Michael Malick, the physician who evaluated Ahern at Arbour and who effected his involuntary admission to that facility. The three entities named as defendants were UMB, Arbour, and Ahern's union, the UMB Patrolmen's Association ("the Union"). Following dismissal of the counts against the Union and Dr. Malick, the remaining parties filed cross motions for summary judgment. The district court entered summary judgment for the defendants on all counts. Ahern now appeals from that portion of the district court's order entering summary judgment in favor of Dr. Moran and the UMB defendants. We affirm. I. I. We view the record evidence in the light most favorable to Ahern, the party against whom summary judgment has entered, drawing all reasonable competing inferences in his favor. See Wightman v. Springfield Terminal Ry. Co., 100 ___ ________ ____________________________ F.3d 228, 230 (1st Cir. 1996). Most of the predicate facts are not in dispute, although Ahern strenuously disputes the significance of some of the facts. The salient events are as follows. In the early morning of September 19, 1991, shortly after midnight, Deborah Cate's telephone answering machine recorded the following message: "Hey. Guess what? We took care of that crybaby old fuck of yours. The niggers splattered his face all over Dorchester. He's gone. He's gone. That fucking crybaby's all gone." Ms. Cate, a UMB student and employee, was not at home at the time of the call and did not hear the message until approximately 6:15 that evening. Cate recognized the voice as that of Ahern, a former boyfriend, and understood the message to mean that Ahern had caused James Igoe, another of Cate's former boyfriends, to be killed. -3- -3- At the time of the September 19th message, Ahern had been a member of the UMB police force for approximately four years. Cate had dated and become intimate with Ahern during the spring and summer of 1990. Before, during, and after that same period, Cate also dated James Igoe, who was married and had children. At the time these relationships were going on concurrently, Ahern knew of Cate's relationship with Igoe. Ahern also knew where Igoe worked.  Cate dated Ahern through the Fourth of July weekend of 1990, at which time she told him that she wanted to end their relationship. Ahern was upset by this and for the remainder of the summer of 1990 he attempted to convince Cate to resume the relationship. According to Cate, he constantly stopped by uninvited to her workplace, interrupting her work, giving her unwanted gifts, and upsetting her. Ahern repeatedly told Cate that he hated Igoe; that if it were not for Igoe, Cate would love Ahern; and that he would "take care of" Igoe. Ahern began a campaign of telephone calls to Cate in which he threatened, among other things, to tell Igoe's wife and children of the relationship between Cate and Igoe, and to send Igoe's wife photographs of Cate and Igoe together. In mid-August 1990, Ahern told Cate that he had obtained Igoe's home address from the UMB police computer and that he was going to go there to tell Igoe's wife and children about Igoe's affair with Cate. Ahern also stalked -4- -4- Cate and called her to let her know that he had been following her. On one occasion, Ahern called Cate while Igoe was visiting at her apartment. When Cate answered the phone, Ahern said, "He's there, isn't he?" and told her to look out the window. When she did, she saw Ahern in a phone booth across the street from her house, looking up at her and displaying what appeared to her to be a gun. Ahern does not dispute these allegations but states that by the fall of 1990 he had ceased his efforts to convince Cate to return to him and had begun dating another woman.  Beginning in the summer of 1990, after she ended her relationship with Ahern, Cate also began to receive obscene and threatening phone calls. In late September or October 1990, Igoe began to receive harassing and threatening calls at work. In the calls to Igoe, a male caller referred to an unnamed woman with whom the caller and Igoe both had relationships.  The sexually explicit calls to Cate and Igoe continued through March 1991. Ahern denied making the calls, though he admitted that he had been "a little crazy" over his break-up with Cate. In mid-March, Cate told Ahern that Igoe was still receiving harassing calls and that she believed that he was the caller. According to Cate, Ahern became nervous and suggested that the caller might be a friend of his who was upset with Cate and Igoe for the way they had treated Ahern. In April 1991, Cate received another sexually -5- -5- explicit message, the content of which was the same as a message left in January. In early July 1991, against Igoe's wishes, Cate ended their relationship. In mid-July, Igoe received another call, in the course of which he exclaimed, "Look, you got what you wanted. You split Debi and I up." At the end of July, Cate received more threatening, sexually explicit messages. She was certain that the caller was Ahern. In August 1991, Cate reported the obscene and threatening phone calls to the Boston Police Department, but did not supply any information about the suspected caller. She also contacted the telephone company, which placed a "trap" on her phone for three weeks. The telephone company then advised Cate that the calls she reported during the three-week period were made from local telephone booths, some from the MBTA station near UMB. Cate continued to receive hang-up calls after the trap was removed. After listening to the September 19th message, Cate became frightened and concerned for Igoe's safety because she thought that the message could be "the real thing." She called Igoe at work, at home, and at his wife's home, but was unable to reach him. Panicked, she called the Boston Police Department. She told a detective about the message and asked if any serious incidents had been reported that day. The detective ultimately recommended that Cate call Patricia McBride, a sergeant on the UMB police force. -6- -6- At approximately 6:30 p.m., Cate called McBride to report the threatening and harassing phone calls. McBride offered to interview Cate at her apartment, rather than at the DPS station, because the complaint involved a fellow officer. At Cate's apartment, Cate suggested that McBride listen to the disturbing message herself. After listening for a short time, McBride was convinced that the caller was Ahern. Cate then told McBride that she was certain that Ahern was the caller for three reasons: she recognized the caller's voice as Ahern's; the caller related the same information in his calls to Cate and to Igoe; and the information related by the caller was known only to Cate and Ahern. While at Cate's apartment, McBride listened to other recorded messages and to a tape of calls to Igoe that Igoe had recorded beginning in February 1991. McBride also collected information from Cate concerning the events of the past eighteen months. Cate then made two tapes for McBride - - one contained obscene and threatening messages that had been left on her answering machine, including the September 19th message and other threats to have Igoe killed; the second tape was a copy of a tape of phone calls to Igoe, featuring graphic accounts of the caller's sexual interludes with Cate and various threats, including threats to have Igoe killed. -7- -7- Cate spoke to Igoe that evening, while McBride was with her, and learned that he was fine. McBride then called Captain Philip O'Donnell, acting director of the UMB DPS, and told him that she needed him to listen to some tape recordings. McBride brought the two tapes to O'Donnell's home. After listening to both tapes, O'Donnell agreed that the caller was Ahern. McBride and O'Donnell were very familiar with Ahern's voice, both in person and on the telephone, from having worked closely with him on a regular basis. There is no suggestion that either officer, or any other defendant, bore any animosity toward Ahern.  Concerned about Ahern's potential dangerousness and the safety of Cate and Igoe, O'Donnell tried to contact consulting psychologist Dr. Tonie Moran in order to get an expert opinion as to whether or not the caller presented a threat to Cate and Igoe, and to ask her advice. O'Donnell made no attempt to contact Cate, Igoe, Ahern, the Union, or any municipal police department on the night of September 19th. He did, however, question McBride about the precautions taken by Cate for the remainder of the evening, and discussed with her the likelihood that Ahern might pose an immediate danger. On September 20, 1991, O'Donnell reported to work at 7:00 a.m., the time Ahern came on duty. He had asked McBride to report for work early as well and to monitor closely Ahern's whereabouts and activities. O'Donnell was -8- -8- not concerned that there was any immediate danger to Igoe because he knew that Igoe lived in New Hampshire and worked in Waltham. O'Donnell thought it highly unlikely that Ahern would drive off campus to find Igoe, because that would certainly have resulted in disciplinary action and possibly the loss of Ahern's job. As for Cate's safety, O'Donnell had instructed McBride to tell her to stay off campus entirely if she could, and in any case to stay away from the UMB boat dock where Cate worked. Dr. Moran called O'Donnell at approximately 7:15 a.m., at which time O'Donnell explained the situation, describing the contents of the tapes in as much detail as possible. Based upon what O'Donnell told her, Dr. Moran advised him that the caller might be homicidal or suicidal and therefore should be evaluated by a mental health professional, preferably a psychiatrist, in order to determine whether he posed a danger to himself or others.1 She cautioned O'Donnell that Ahern's career as a police officer was not necessarily over as a consequence of the events described; that with intervention and proper treatment, it was possible that things could return to normal, with no further problems.  ____________________ 1The record contains contrary accounts as to what Dr. Moran told O'Donnell to do about the situation. O'Donnell recalled in his deposition and elsewhere that Dr. Moran said that Ahern should be taken for evaluation against his will if necessary. Dr. Moran, however, contends that she never made this recommendation and that she played no part in the later decision to admit Ahern to Arbour.  -9- -9- Dr. Moran stated that she would not be able to examine Ahern herself that day, but offered to contact another doctor with extensive experience as a psychiatric evaluator. It took several hours to make final arrangements for an evaluation at Arbour, largely due to difficulties in determining which facilities would be covered by Ahern's medical insurance carrier. During the same morning, September 20, O'Donnell played portions of the tapes for Lieutenant James Wise, without giving him any information about them, and asked if he could identify the caller. Wise, who had been Ahern's training officer, and who had worked directly with him on a daily basis for two years, replied that the voice was Ahern's.  Ahern reported for work at his usual time of 7:00 a.m. and was assigned an armed and uniformed post patrolling the UMB campus in a marked police cruiser. At about 1:00 or 1:30 p.m., O'Donnell called him back to the station and instructed him to change into plain clothes, put his weapon away, and meet O'Donnell in the DPS director's office. When Ahern arrived, O'Donnell, McBride, and another female officer were present. O'Donnell informed him that Cate had made allegations against him regarding obscene and threatening phone calls to her and Igoe; O'Donnell said that Ahern was sick and needed help, and that O'Donnell wanted him to undergo a psychiatric evaluation. Ahern denied the allegations.  -10- -10- According to Ahern, he asked what would happen if he did not agree to be evaluated and was told that he "was going one way or the other." Ahern says that at this point he became nervous and frightened; however, he concedes that he agreed to go. Ahern allegedly asked to speak to a lawyer or a union representative, but O'Donnell simply grabbed him "like a buddy" and "carted" him out. O'Donnell testified in deposition, however, that Ahern was "extremely cooperative" and never gave any indication that he did not want to go with the officers.  When they arrived at Arbour, O'Donnell explained the situation to a staff member and, at some point, gave the tapes to a staff member. The officers stayed at the hospital until about 4:30 p.m., when they were informed that Ahern had refused the option of applying for voluntary admission and was being admitted involuntarily. Ahern remained in the hospital for 12 days. Cate received several hang-up calls during the time that Ahern was hospitalized. She was told by an Arbour staff member who had contacted her that Ahern had access to a pay phone. Ahern was released from Arbour on October 2, 1991. His discharge summary listed the reason for discharge as expiration of the ten-day period authorized by statute. After his release, Cate continued to get "countless numbers" of harassing phone calls each day. She continued to receive -11- -11- such calls until she moved in the spring of 1992. The calls to Igoe also continued, at least through the winter of 1991. Ahern was placed on paid administrative leave as of September 20, 1991, and was instructed in October 1991 to set up an appointment with Dr. Moran so that she could evaluate his fitness for duty. They met in November 1991, and Dr. Moran twice consulted with the attending psychiatrist who treated Ahern at Arbour. Dr. Moran subsequently issued a report in January 1992, in which she expressed her opinion that Ahern could return to full duty on the condition that he engage in a one-year course of psychotherapy. In February 1992, David Cella, director of DPS, informed Ahern that the DPS possessed evidence sufficient to warrant a finding that Ahern had placed threatening phone calls to Cate and Igoe. Cella stated that, at a minimum, Ahern's actions constituted conduct unbecoming an officer and very likely violated other department regulations. Cella offered to permit Ahern to return to duty under various conditions, including the inclusion of a letter of reprimand in Ahern's file. Ahern refused, on the ground that it would constitute an admission that he had made the calls. After Ahern was provided extensive advice about his rights, a hearing was held in September 1992 as to Ahern's continued fitness for duty. Ahern apparently did not submit a rebuttal case, and was terminated from his employment with UMB on October 2, 1992, for "conduct unbecoming an officer." -12- -12- A Union grievance resulted in lengthy hearings before an arbitrator at which the Union and UMB presented extensive evidence. In January 1994, the arbitrator found that the evidence "clearly and convincingly" established that Ahern had made the calls to Cate and Igoe and that there was just cause for termination. Ahern subsequently filed the present action. In its order granting summary judgment to the defendants, the district court first found that Ahern had not been seized so as to implicate the Fourth Amendment because he had agreed to go to Arbour for psychiatric evaluation. Alternatively, the district court found that the officers had reasonably treated the situation as an emergency creating a likelihood of serious harm by reason of mental illness, and acted consistently with Massachusetts law, Mass. Gen. Laws ch. 123, 12(a), and with the Due Process Clause of the Fourteenth Amendment. The court also ruled that in any case, the UMB defendants were entitled to qualified immunity and that, on the state-law claims, Dr. Moran and the UMB officers were protected by Mass. Gen. Laws ch. 123, 22. This provides for immunity from civil rights suits for, inter alia, _____ ____ qualified psychologists and police officers who act pursuant to the provisions of Mass. Gen. Laws ch. 123. As to Ahern's claims arising from the termination of his employment, the -13- -13- district court held that UMB had satisfied the due process requirements of notice and opportunity to be heard. II. II. A. A. On appeal, Ahern contends that the district court erred in its rulings on three issues: (i) Ahern's claim brought under 42 U.S.C. 1983, alleging that his involuntary admission to Arbour violated his Fourth Amendment and Due Process Clause rights; (ii) Ahern's section 1983 claim that the defendants deprived him of his right to due process with respect to his termination; and (iii) the district court's ruling that the defendants were entitled to qualified and statutory immunity. Our review of the district court's grant of summary judgment is de novo. See Wightman, 100 F.3d at 230. Summary __ ____ ___ ________ judgment is proper if the record materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). After a thorough review of the record and careful consideration of the arguments presented, we conclude that the district court's rulings were proper. B. B. We begin with Ahern's section 1983 claims concerning his involuntary admission to Arbour. A plaintiff asserting a cause of action under 42 U.S.C. 1983 must show that the challenged conduct is attributable to a "person" who -14- -14- acted "under color of state law," and that it caused the plaintiff to be deprived of rights, privileges, or immunities secured by the United States Constitution or by federal law. See Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). By ___ ____ ______ the terms of the statute itself, a section 1983 claim must be based upon a federal right. See Baker v. McCollan, 443 U.S. _______ ___ _____ ________ 137, 144 n.3 (1979). On appeal, Ahern argues that the defendants failed to comply with the Massachusetts involuntary admission statute, Mass. Gen. Laws ch. 123, 12.2 Ahern cannot assert a section 1983 cause of action for violation of the state statute, see McKinney v. George, 726 F.2d 1183, 1188, 1190 ___ ________ ______ (7th Cir. 1984); nor does Ahern claim that the statute itself is unconstitutional in its prescribed standards and procedures for involuntary admission to a psychiatric facility. Still, the statutory provisions may bear upon analysis of Ahern's Fourth Amendment and due process rights. We also note at the outset that any section 1983 claim against Dr. Moran is doubtful. She was a private psychologist who occasionally consulted with the UMB DPS. It is unclear that she was a state actor or acted under color of  ____________________ 2Mass. Gen. Laws ch. 123, 12(a) refers to the involuntary "admission," rather than "commitment," of an individual for a period of ten days. -15- -15- state law,3 and even more doubtful that she can be deemed responsible for the admission. But given our disposition of the underlying constitutional claims, we need not decide these issues. We examine in turn Ahern's Fourth Amendment and due process arguments with respect to his detention and involuntary admission. We focus our resolution of this appeal on the constitutional questions presented, rather than on the qualified immunity defense, in order to clarify the requirements of the Fourth Amendment in this unique context. 1. 1. It is now well-settled that the Fourth Amendment's protections against unreasonable searches and seizures apply to the involuntary hospitalization of persons for psychiatric reasons. See McCabe v. Life-Line Ambulance Serv., Inc., 77 ___ ______ ________________________________ F.3d 540, 544 (1st Cir.), cert. denied, --- U.S. ---, 117 S. ____________ Ct. 275 (1996). The district court rejected Ahern's Fourth Amendment argument, based on its finding that Ahern had not been seized. On this threshold question, we adopt a different approach. The Supreme Court has explained that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the  ____________________ 3See, e.g., Rockwell, 26 F.3d at 260; Pino v. Higgs, 75 ___ ____ ________ ____ _____ F.3d 1461, 1465-66 (10th Cir. 1996). -16- -16- incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. _____________ __________ 544, 554 (1980) (footnote omitted). Ahern admits that, during the confrontation at the UMB DPS station, he agreed to go for an evaluation. Nevertheless, Ahern contends that O'Donnell and McBride took him to Arbour against his will, thereby seizing him for Fourth Amendment purposes. In support of this claim, Ahern asserts that O'Donnell and McBride told him that he was "going one way or the other," and that he understood that to mean that if he did not go to the hospital voluntarily, he would be taken by force. The district court ruled that Ahern had not been seized, based upon, inter alia, its conclusions that "Ahern's _____ ____ own evidence demonstrates that despite his protestations of innocence, he gave all external indications of voluntarily agreeing to submit to an evaluation," and that Ahern never "communicated that he had changed his mind." But the question seems relatively close, and we will assume for argument's sake that the facts taken in the light most favorable to Ahern establish that he was seized. We therefore ask whether the assumed seizure violated the Fourth Amendment. To determine the Fourth Amendment standard of reasonableness that applies to the defendants' actions, some background explanation is in order. The Massachusetts statute provides four different categories of procedures for -17- -17- seeking the involuntary hospitalization of an individual for a ten-day period. Mass. Gen. Laws ch. 123, 12. The first two categories permit a "qualified physician, psychologist, or psychiatric nurse" to sign a "pink paper" authorizing restraint of the person, if the signor believes that the person would create a "likelihood of serious harm by reason of mental illness." McCabe, 77 F.3d at 547-48. The fourth ______ category establishes procedures for obtaining a warrant for the apprehension of persons who are potentially dangerous by reason of mental illness. See id. at 548. Ahern, however, ___ ___ was detained and transported to Arbour under the "category- three" procedure, which does not require the signing of a warrant or pink paper. This procedure provides: In an emergency situation, if a physician, qualified psychologist or qualified pediatric nurse . . . is not available, a police officer, who believes that failure to hospitalize a person would create a likelihood of serious harm by reason of mental illness may restrain such person and apply for the hospitalization of such person for a ten day period at [an authorized facility]. . . . Mass. Gen. Laws ch. 123, 12(a).4  ____________________ 4The statute does not define "emergency," but does defines "likelihood of serious harm" to mean: (1) a substantial risk of physical harm to the person himself as manifested by evidence of, threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment -18- -18- A nonconsensual search or seizure is unreasonable in the absence of a judicial warrant issued upon probable cause. See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, ___ _______ _______________________________ 619 (1989). But "[t]he ultimate standard set forth in the Fourth Amendment is reasonableness," Cady v. Dombrowski, 413 ____ __________ U.S. 433, 439 (1973), under "all of the circumstances," United States v. Montoya de Hernandez, 473 U.S. 531, 537 ______________ _____________________ (1985). "[A]lthough both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required." New Jersey v. T.L.O., 469 U.S. 325, 340 (1985) __________ ______ (citation and internal quotation marks omitted). The Supreme Court has recognized a particular exception to the warrant and probable-cause requirements in cases involving "special needs, beyond the normal need for law enforcement." Griffin v. Wisconsin, 483 U.S. 868, 873 _______ _________ (1987) (citation omitted). In McCabe, 77 F.3d 540, we ______ applied the special needs exception to a Fourth Amendment challenge to a municipal policy permitting forcible, warrantless entries into private homes for the purpose of executing pink papers. In that case, a pink paper had been issued pursuant to the category-two procedure of the Massachusetts statute.  ____________________ is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community. Mass. Gen. Laws ch. 123, 1. -19- -19- McCabe did not directly resolve the question before ______ us here. Under the category-two procedure, police officers act upon a determination made by a qualified physician, psychologist, or psychiatric nurse, albeit without benefit of an examination, and McCabe emphasized "the presence of a ______ search authorization by an impartial, or at least a relatively impartial person." 77 F.3d at 552. Under the category-three procedure, however, police officers make the decision whether to "seize" the person themselves without necessarily securing expert advice. Where, as here, we are arguably dealing with a police officer's own decision -- rather than that of an impartial expert -- we think that Fourth Amendment standards require a showing of probable cause; that is, circumstances warranting a reasonable belief that the person to be seized does (as outlined in the statute) have a mental health condition threatening serious harm to himself or others. Other circuits have so held,5 and involuntary hospitalization is no less a loss of liberty than an arrest. We agree with the Tenth Circuit that: The state has a legitimate interest in protecting the community from the mentally ill and in  ____________________ 5See, e.g., Pino v. Higgs, 75 F.3d 1461, 1467-68 (10th ___ ____ ____ _____ Cir. 1996); Sherman v. Four County Counseling Ctr., 987 F.2d _______ ___________________________ 397, 401 (7th Cir. 1993); Glass v. Mayas, 984 F.2d 55, 58 (2d _____ _____ Cir. 1993); Maag v. Wessler, 960 F.2d 773, 775-76 (9th Cir. ____ _______ 1991); Gooden v. Howard County, Md., 917 F.2d 1355, 1362 (4th ______ __________________ Cir. 1990), rev'd on other grounds, 954 F.2d 960, 968 (4th _____ __ _____ _______ Cir. 1992) (en banc); McKinney, 726 F.2d at 1187; In re _______ ________ _____ Barnard, 455 F.2d 1370, 1373-74 (D.C. Cir. 1971). _______ -20- -20- protecting a mentally ill person from self-harm. A person suspected of mental illness possesses a right to liberty and a right to freedom from unfounded charges of mental infirmity. Because a seizure of a person for an emergency mental health evaluation raises concerns that are closely analogous to those implicated by a criminal arrest, and both are equally intrusive, we conclude that the "probable cause" standard applies here . . . . Pino, 75 F.3d at 1468. ____ The proper inquiry is whether probable cause existed at the moment the arrest was made, based on the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information. Beck ____ v. Ohio, 379 U.S. 89, 91 (1964). Here, then, probable cause ____ existed if, at the moment Ahern was "seized" for evaluation, the facts and circumstances reasonably believed by the UMB officers indicated that Ahern presented a likely threat of serious harm to himself or others by reason of mental illness. See Chathas v. Smith, 884 F.2d 980, 987 (7th Cir. ___ _______ _____ 1989). Applying this standard, we find that the undisputed evidence demonstrates that the officers had probable cause to believe that Ahern made the calls to Cate and Igoe, and that, in view of the content of the tapes and Ahern's past behavior, Ahern needed to be evaluated by a mental health professional as soon as possible in order to determine whether he might be dangerous by reason of mental illness. Moreover, the belief that Ahern might be dangerous was shared by Dr. Moran, a qualified psychologist, and corroborated by -21- -21- Dr. Malick, a licensed physician, who concluded after conducting his own examination that Ahern should be admitted to Arbour. In response, Ahern claims that the UMB DPS knew of and was investigating Cate's allegations against him before the September 19th call. The record contains some support for this claim, in the form of deposition testimony of other UMB officers. Nevertheless, we agree with the district court's conclusion that "even if there were some earlier investigation, the complaint by Cate on September 19, 1991, was adequate to trigger an 'emergency' response by the department" because the September 19th call "represented a change from threats to do harm, to a representation that harm had been done."  Ahern next says that the defendants' delay in acting upon the September 19th call negates the existence of an emergency warranting a unilateral seizure without more elaborate procedural safeguards. Cf. McCabe, 77 F.3d at 550 ___ ______ n.10. Ahern places great emphasis on the time that elapsed between his return to the station on the afternoon of September 20th and both (i) the recording by Cate's machine of the September 19th message (about 37 hours), and (ii) the time that the UMB officers formed the belief that Ahern was the caller (about 18 hours). Indeed, during the morning and early afternoon of September 20th, O'Donnell permitted Ahern -22- -22- to patrol the UMB campus armed with a gun in a marked patrol car. This argument is not without force; in hindsight, some of O'Donnell's actions are equivocal. Nonetheless, the objective facts known to the defendants clearly demonstrate that a reasonable person would have believed that Ahern posed a "likelihood of serious harm by reason of mental illness" and to believe that Ahern's continued presence in the UMB community constituted an "emergency." The speed with which an emergent problem is resolved is not itself determinative of the existence vel non of an emergency. We agree with the ___ ___ district court that the undisputed facts show that the delay "resulted largely from an effort to take appropriate action in a safe and measured manner." Ahern further suggests that the defendants could not reasonably have viewed him as dangerous because he did not engage in dangerous behavior between the phone call and his seizure, and also because he displayed no visible signs of mental illness while in the defendants' presence. Probable cause in this context, however, requires only the likelihood of dangerous activity -- Ahern's threat, coupled __________ with his history of harassment, threats, and stalking, sufficed to show that failure to hospitalize Ahern would create some danger of serious physical harm.  Finally, the summary judgment materials contain no support for Ahern's allegation that the defendants gave false -23- -23- or misleading information to Dr. Malick that suggested that Ahern might be suicidal. Dr. Malick's notes contained the remarks, "apparently suicidal threats today" and "told psychiatrist he planned to kill self too." Ahern says that he never made such comments to Dr. Malick. This evidence, however, is simply too insubstantial to create a genuine dispute of material fact.  Our conclusion is not altered by the fact that Ahern denied making the phone calls or by the fact that he was ultimately released from Arbour without a finding that he continued to pose a threat to himself or others. "If there is probable cause, it is irrelevant if the suspect turns out to be noncommitable. The arrest is still legal." Chathas, _______ 884 F.2d at 987; see Baker v. McCollan, 443 U.S. at 145. ___ _____ ________ Similarly, it is irrelevant whether the defendants acted in an ideal manner. We conclude that there is no trialworthy issue as to the Fourth Amendment claim; the seizure, if such there was, was lawful under the Fourth Amendment.  2. 2. The district court dealt extensively with Ahern's various theories of due process violations in connection with his involuntary admission to Arbour. On appeal, Ahern has not attempted to articulate any due process theory entitling him to relief, but has simply argued that the defendants lacked authority to use the category-three procedure because no emergency existed, and that a warrant should have been -24- -24- obtained under the "category-four" procedure, Mass. Gen. Laws ch. 123, 12(e). We therefore treat his other allegations of due process violations, raised in the district court, as waived. In this context, the Fourth Amendment protection against unreasonable seizures more specifically applies to the complained-of conduct than does the Due Process Clause, and thus defines what process is due in the context of the specific conduct alleged to have violated Ahern's constitutional rights. Albright v. Oliver, 510 U.S. 266, 273 ________ ______ (1994); Gerstein v. Pugh, 420 U.S. 103, 125 n.27 (1975); ________ ____ McKinney, 726 F.2d at 1187. We have already explained, in ________ discussing the Fourth Amendment point, that the evidence warranted the police in believing that an "emergency" existed by virtue of the real possibility that Ahern might harm Igoe or Cate. C. C. Ahern also raises a separate due process claim, arguing that he was deprived due process in the proceedings leading to the termination of his job. There is no dispute that Ahern enjoyed constitutional protections in his continued employment with the UMB DPS. See Cleveland Bd. of ___ ________________ Educ. v. Loudermill, 470 U.S. 532 (1985). In the district _____ __________ court, he made several arguments to this effect, but the district court correctly rejected his challenges to the adequacy of the notice and opportunity to be heard afforded -25- -25- him prior to his termination. On appeal Ahern has waived these arguments. Ahern's only argument on appeal with respect to this due process claim is that the UMB defendants "destroyed and manipulated evidence in bad faith." In particular, he claims that the UMB defendants concealed or destroyed a tape recording of an interview with Igoe conducted by McBride; this would have proved relevant and exculpatory, Ahern argues, by showing that Igoe thought that two different people had made the threatening phone calls to him. Ahern also claims that the defendants used a log of the calls made to Igoe that was prepared by McBride, rather than Igoe's own actual log of calls. According to Ahern, McBride's version was incomplete and Ahern was thus prejudiced in his ability to show that some of the calls were not made by him.  We readily reject Ahern's argument. There is no evidence that witnesses were unavailable for examination by Ahern prior to his termination hearing; Ahern could readily have adduced the allegedly-concealed information by questioning Igoe and McBride. Likewise, he could have discovered UMB's alleged destruction and manipulation of evidence by examining Igoe, who would have had no reason to lie at the pretermination hearing, and who later admitted in deposition that he believed that two different people made the threatening phone calls. Furthermore, it appears that at most, the destroyed evidence would have shown the existence -26- -26- of a second caller; Ahern never suggests that with the additional evidence he would have been able to show that he never made the harassing and threatening calls. We note that Ahern was afforded a three-day hearing before an independent arbitrator, who concluded after reviewing the "plethora of evidence" presented by both parties that the evidence "clearly and convincingly" established that Ahern made the calls to Cate and Igoe. In these circumstances, we cannot say that Ahern was denied a fair opportunity to contest his termination.  III. III. We need only add a brief word on the subject of qualified immunity. The district court found that the law at the time of Ahern's involuntary admission to Arbour "did not clearly identify that O'Donnell and McBride's actions might violate the Constitution." See Harlow v. Fitzgerald, 457 ___ ______ __________ U.S. 800, 818 (1982). On appeal, Ahern's sole argument on this issue is that the disposition of the qualified immunity question before the resolution of alleged factual disputes is premature.  We disagree. The question whether a defendant is entitled, on a given set of facts, to the protection of qualified immunity is a question of law. See Elder v. ___ _____ Holloway, 510 U.S. 510, 516 (1994); Wood v. Clemons, 89 F.3d ________ ____ _______ 922, 927 (1st Cir. 1996). Because the entitlement is "an immunity from suit rather than a mere defense to liability," ________ ____ ____ -27- -27- Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), the Supreme ________ _______ Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation," Hunter v. Bryant, 502 U.S. 224, 227 (1991) ______ ______ (citations omitted). Finally, Ahern argues that, on his state-law claims, the district court erred in ruling that the defendants are entitled to statutory immunity under Mass. Gen. Laws ch. 123, 22. This section creates immunity from civil suits for physicians, qualified psychologists, and police officers who act "pursuant to the provisions" of chapter 123. Because we have already determined that the officers acted in conformance with the statute, they were entitled to immunity under this provision on the state-law claims. Dr. Moran similarly acted within the bounds of the statute, to the extent that she was responsible for the decision to detain and transport Ahern to Arbour. We find no error.  IV. IV. For the foregoing reasons, the judgment of the district court is AFFIRMED. Costs on appeal awarded to AFFIRMED. Costs on appeal awarded to ________ _____________________________ Defendants-appellees. Defendants-appellees. ____________________ -28- -28-