

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-16-2005

# Must v. W Hills Pol Dept

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-4491

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Must v. W Hills Pol Dept" (2005). *2005 Decisions.* Paper 1450.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1450

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-4491

———————

DALE A. MUST,
                    Appellant

v.

WEST HILLS POLICE DEPARTMENT;
DEPARTMENT OFFICER JAMES STUTZMAN;
DEPARTMENT OFFICER EDWARD FISHER;
DEPARTMENT OFFICER JERRY K. BELLAK;
DEPARTMENT OFFICER MARK BRITTON

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-cv-00111J
District Judge:  The Honorable Robert J. Cindrich

———————

Submitted Under Third Circuit LAR 34.1(a)
February 7, 2005

———————

Before: BARRY, FUENTES, and BECKER, <u>Circuit Judges</u>

———————

(Opinion Filed:March 16, 2005)

———————

OPINION

———————

BARRY, <u>Circuit Judge</u>

This appeal involves a claim by Dale A. Must, brought under 42 U.S.C. § 1983, that the actions of Officers of the West Hills Police Department violated his Fourth Amendment rights. After concluding that the Officers were entitled to qualified immunity and that Must had failed to establish a cognizable basis for municipal liability, the District Court granted summary judgment in favor of all defendants. We have jurisdiction under 28 U.S.C. § 1291, and will affirm.

I.

Because we write only for the parties, we will limit our discussion of the facts to those which are material to our disposition of this appeal. The substance of Must's section 1983 claim derives from three separate encounters involving himself and various Officers[1] of the West Hills Police Department ("WHPD").

The first encounter occurred on March 2, 1997. The WHPD received a call from one of Must's neighbors indicating that Must was acting strangely, attempting to enter parked vehicles, and running onto porches in the neighborhood. Must admits that he had been doing wind sprints "up and down the alley just to get rid of built up anxiety." Deposition of Dale A. Must, at 24. Two Officers arrived at Must's residence, a residence he shared with his mother, and observed him piling up various items in a common

---

[1]Given our conclusion that all four of the Officer-defendants are entitled to qualified immunity, we need not differentiate between them.

driveway adjacent to the property. When the Officers asked Must about his behavior, he replied that the items "were my personal affects to do with what I want, I mean, if I choose to throw them out." Id. at 22. Must also told the Officers that he had recently married and was waiting for Congressman Murtha to come and pick him up for the purpose of presenting Must with an award, although he now contends that these statements were intended to be sarcastic.

After conversing with Must, the Officers contacted Michelle Tomera, a Crisis Intervention worker,[2] who was prepared to travel to the location to observe him directly. While one of the Officers was giving Tomera directions, the other Officer indicated that Must had agreed to be taken to the hospital for evaluation. Must denies that he gave his consent. Based on her understanding that Must had agreed to be transported to the hospital, Tomera arranged to meet Must and the Officers at the hospital. Must was subsequently placed in a police cruiser and taken to the hospital for a psychiatric evaluation.

At some point after Must arrived at the hospital, Tomera completed a section 7302 warrant authorizing a psychiatric evaluation. Must became violent with hospital

---

[2]The mental health workers at Crisis Intervention are the county officials responsible for processing petitions for involuntary examinations. If a Crisis Intervention worker concludes that an involuntary examination is justified, he or she may issue a warrant authorizing the police to take the person to a medical facility for examination. See 50 Pa. Cons. Stat. § 7302(a) (2004); Doby v. DeCrescenzo, 171 F.3d 858, 864-65 (3d Cir. 1999). We will refer to these written authorizations as "section 7302 warrants." See Doby, 171 F.3d at 865.

attendants and was forcibly restrained.  The physician who conducted his evaluation diagnosed him as severely mentally disabled.  As a result, Must was involuntarily committed for observation and treatment.

The second encounter at issue took place on March 10, 1997.  Another neighbor, Christen Maggs, telephoned the WHPD to complain that Must had been lingering on her back porch for a period of 30-45 minutes.  Maggs stated that Must had also attempted to open the basement door to her home.  Upon arriving at Maggs' residence, the responding Officers observed Must standing on the back porch and looking into a window.  Must told the Officers that he was locked out of his house and that he wanted to use Maggs' phone to call his mother so she would let him in.

At this point, the Officers placed Must in the police cruiser and proceeded to interview Maggs.  The remaining details of this incident are disputed.[3]  Must claims that he was patted down and handcuffed by the Officers prior to being placed in the cruiser, and not read his Miranda warnings.  According to Must, the Officers then drove him to the police station where he was held in an office for a period of 45 minutes before being driven back to his home.  He concedes that he was not questioned by any Officer during this period of time.

---

[3]Appellees claim that, after questioning Maggs, the Officers contacted Crisis Intervention and were informed that the incident did not warrant a psychiatric evaluation. Thereafter, appellees contend, Must was promptly released with a warning not to return to the location.

4

The final encounter occurred on June 27, 1998. Must's mother contacted the police complaining that he had broken a glass table top in their home and had threatened her with a frying pan. She further indicated that she wanted him to vacate the residence and asked that he be evaluated by mental health officials. Officers subsequently located Must in the vicinity of the residence, and he denied breaking the table or threatening his mother. When informed that his mother no longer wanted him to live with her, Must suggested that the Officers take him to the home of a friend, Tom Hoffman. The Officers contacted Crisis Intervention workers, who agreed to meet with Must at Hoffman's residence.

After meeting with Must, his mother, and the Officers, the Crisis Intervention workers suggested to Must that he be taken to the hospital for evaluation. Feeling that he had no choice in the matter, he agreed.[4] He was again given a psychiatric evaluation at the hospital, pursuant to a section 7302 warrant signed by David Quinn from Crisis Intervention. Must was committed for involuntary treatment based on a physician's diagnosis that he had a severe mental disability. In the early-morning hours of June 28, however, he was reexamined at the request of his attorney by a different physician, who concluded that Must did not pose an imminent threat to either himself or others. Given this new diagnosis, Must was released.

---

[4]Once again, the parties dispute the issue of whether Must voluntarily agreed to be taken to the hospital. For purposes of this appeal, we will assume, arguendo, that Must did not consent to the transport.

II.

Our review of the District Court's grant of summary judgment is de novo. Kopec

v. Tate, 361 F.3d 772, 775 (3d Cir. 2004). Summary judgment is appropriate when a

review of the record demonstrates "that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). We are required to view the facts in the light most favorable to Must, the non-

moving party, and accept his allegations as true provided that they are reasonably

supported by the record. Kopec, 361 F.3d at 775.

Must named four individual Officers of the WHPD and the WHPD itself as

defendants in this action. Because the legal standards governing the potential liability of

these two classes of defendants are different, we will discuss the individual and municipal

defendants separately.

A.    Individual Defendants[5]

Qualified immunity shields an executive official from suit under section 1983 so

long as the officer's "conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." Berg v. County

of Allegheny, 219 F.3d 261, 272 (3d Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S.

800, 818 (1982)). When considering a claim of qualified immunity, the threshold inquiry

---

[5]Given our conclusion that each of the Officers is entitled to qualified immunity, we
need not address appellees' contention that Must's claim against Officer Mark Britton
was barred by the statute of limitations.

6

is whether the officer's alleged conduct violated a constitutional right.  Saucier v. Katz,
533 U.S. 194, 201 (2001).  "If no constitutional right would have been violated were the
allegations established, there is no necessity for further inquiries concerning qualified
immunity."  Id.

Even if the plaintiff's submissions are sufficient to make out a constitutional
violation, the officer remains entitled to immunity "when she makes a decision that . . .
reasonably misapprehends the law governing the circumstances she confronted."
Brosseau v. Haugen, 125 S. Ct. 596, 599 (2004).  At this stage of the analysis, the
question is whether the constitutional right that the officer has allegedly violated was
"clearly established" at the time he or she acted.  Id.  In other words, qualified immunity
will apply unless "it would be clear to a reasonable officer that his conduct was unlawful
in the situation he confronted."  Saucier, 533 U.S. at 202.

Must's lone constitutional argument is that the Officers' actions on each of the
three encounters in question violated the Fourth Amendment.  It is well settled that the
Fourth Amendment applies to seizures made for civil purposes, and the central inquiry is
the same as in the criminal context—whether the government's conduct was reasonable
under the circumstances.  Doby, 171 F.3d at 871.

In Griffin v. Wisconsin, 483 U.S. 868 (1987), the Supreme Court held that states
may act without satisfying the normally applicable warrant and probable cause
requirements where "special needs, beyond the normal need for law enforcement, make

[those requirements] impracticable." Id. at 873 (citations omitted). Adopting the reasoning of the First Circuit in McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540 (1st Cir. 1996), we concluded in Doby that "the temporary involuntary commitment of those deemed dangerous to themselves or others qualifies as a 'special need' permitting the state to act without a warrant." 171 F.3d at 871. Doby examined the constitutionality of an involuntary examination conducted pursuant to section 7302(a)(1) of the Pennsylvania Mental Health Procedures Act ("MHPA"), which authorizes the seizure of a mentally disabled person following the issuance of a section 7302 warrant, and concluded that the statutory scheme set forth in section 7302(a)(1) satisfies the requirements of the Fourth Amendment. See 50 Pa. Cons. Stat. § 7302(a)(1) (2004); Doby, 171 F.3d at 872 (observing that the section 7302 warrant is "authorized by a neutral and detached official").

The First Circuit distinguished McCabe in Ahern v. O'Donnell, 109 F.3d 809 (1st Cir. 1997), and declined to extend the special needs exception to a provision of the Massachusetts involuntary commitment statute that closely resembles section 7302(a)(2) of the MHPA. 109 F.3d at 817 ("Where, as here, we are arguably dealing with a police officer's own decision – rather than that of an impartial expert – we think that Fourth Amendment standards require a showing of probable cause."). The First Circuit held that an officer making an "emergency seizure" of an apparently mentally disabled individual without first consulting a neutral mental health official must demonstrate "circumstances

8

warranting a reasonable belief that the person to be seized does . . . have a mental health condition threatening serious harm to himself or others." Id. at 817. Other courts of appeals have agreed. See id. at 817 n. 5 (collecting cases).

We have not yet addressed whether Doby extends to emergency seizures not authorized by a section 7302 warrant. For purposes of this appeal, we will assume without deciding that seizures made pursuant to section 7302(a)(2), 50 Pa. Cons. Stat. § 7302(a)(1) ("Emergency Examination Without a Warrant"), must be supported by probable cause.

With these principles in mind, we return to the three encounters cited by Must.

1.    March 2, 1997

Because Must claims that the Officers transported him to the hospital without his consent prior to the involvement of Crisis Intervention, we will consider this seizure as having been made pursuant to section 7302(a)(2) of the MHPA. Accordingly, given our previously discussed assumption concerning the scope of Doby, we would be required to ask, for the purpose of determining whether a Fourth Amendment violation occurred, whether the Officers had probable cause to believe that Must presented an imminent threat of serious bodily harm to either himself or others at the time of the seizure. See, e.g., S.P. v. City of Takoma Park, 134 F.3d 260, 266 (4th Cir. 1998); Ahern, 109 F.3d at 817; Pino v. Higgs, 75 F.3d 1461, 1468 (10th Cir. 1996).

We need not reach that issue here, however, because even assuming that Must

could establish that a constitutional right had been violated, the governing law was not clearly established. The Supreme Court has explained that the shield of qualified immunity will apply unless the law "put the officer on notice that his conduct would be clearly unlawful." Saucier, 533 U.S. at 202; see also City of Takoma Park, 134 F.3d at 266 ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."). Must has failed to direct our attention to case law that would have put the Officers on notice that his indisputably strange behavior did not rise to a level justifying an involuntary psychiatric evaluation. The fact that in Doby a related provision of the MHPA passed Fourth Amendment muster only bolsters our conclusion that qualified immunity should apply here.

2.    March 10, 1997

We accept appellees' argument that this incident should be analyzed as a "more mainstream Fourth Amendment seizure." Therefore, we will consider whether the Officers had probable cause to make a criminal arrest.[6]

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 125 S. Ct. 588, 593 (2004). Here, there was ample evidence that Must had committed one or more criminal offenses. His arrest, therefore,

---

[6]We cannot, however, endorse appellees' attempt to characterize the seizure which occurred (a 45 minute detention at the police station, according to Must's allegations) as a mere Terry stop.

was supported by probable cause. Because no constitutional violation occurred, section 1983 liability cannot be premised on this encounter.

### 3. June 27, 1998

As a factual matter, this incident is materially distinguishable from the events of March 2, 1997. On that occasion, Must was transported to the hospital before any worker from Crisis Intervention became meaningfully involved in the process. Here, by contrast, it is undisputed that Crisis Intervention workers met with Must in person, spoke with witnesses, and ultimately recommended that he submit to a psychiatric evaluation. Thus, it was the workers from Crisis Intervention, and not the Officers themselves, who made the determination that an evaluation was warranted. We, therefore, find that the Officers' actions conformed to the parameters of section 7302(a)(1) of the MHPA, the precise section of that Act which we considered and approved in Doby. We again conclude that no constitutional violation occurred.

In sum, the Officers are entitled to qualified immunity as to each of the three encounters described in Must's complaint. Accordingly, we will affirm the District Court's order granting summary judgment in favor of the individual defendants.

### B. Municipal Defendant

The unconstitutional acts of a municipality's employees cannot be imputed to the principal on a theory of respondeat superior. Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). In

11

order to hold a municipality liable under section 1983, the plaintiff must demonstrate that any violation of Fourth Amendment rights that occurred was caused by a policy or custom of the municipality.  Berg, 219 F.3d at 275.  "Once a [section] 1983 plaintiff identifies a municipal policy or custom, he must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  Id. at 276 (quotation omitted).

In limited circumstances, the failure to adequately train municipal employees may establish liability under section 1983.  As a general rule, the plaintiff must provide evidence of a pattern of constitutional violations in order to premise municipal liability on a failure-to-train theory.  See id.  The Supreme Court, however, has created a limited exception to this principle.  In circumstances where "a violation of federal rights [is] a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations," a section 1983 plaintiff may assert a failure-to-train claim without establishing a pattern of violations.  Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 409 (1997).

Must takes the position that the WHPD is liable on a failure-to-train theory.  We disagree.  The only incident which arguably involved a constitutional violation – March 2, 1997 – was problematic for the sole reason that, because we must view the facts in light most favorable to Must, the Officers mistakenly advised Tomera that Must had agreed to be transported to the hospital for a psychiatric evaluation.  Until that point, the

12

Officers were prepared to wait for Tomera to arrive at Must's residence for the purpose of determining whether a section 7302 warrant should issue. The record indicates that on every other occasion the Officers followed a policy of contacting workers from Crisis Intervention and awaiting their assessment of Must's mental health. In our view, the "moving force" behind any constitutional violation which may have occurred on March 2, 1997 was the individual Officers' miscommunication concerning Must's willingness to agree to a transport and not any shortcoming in the training provided by the WHPD. See Berg, 219 F.3d at 276.

We, therefore, conclude that the District Court properly granted summary judgment to the municipal defendant, the WHPD.

### III.

For the foregoing reasons, we will affirm the judgment of the District Court.

13